# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

SUGAR CANE GROWERS COOPERATIVE
OF FLORIDA,

  Plaintiff,

v.                                                                    Civil Action No. _____

UNITED STATES ARMY CORPS OF
ENGINEERS,

  Defendant.
_____/

## COMPLAINT

Plaintiff, Sugar Cane Growers Cooperative of Florida (the "Cooperative"), sues Defendant, United States Army Corps of Engineers (the "Corps").

**I.    INTRODUCTION**

1. Promises—especially those made by statute and rule—are meant to be kept. When Congress authorized the Comprehensive Everglades Restoration Plan ("CERP") in the Water Resources Development Act of 2000 ("WRDA 2000"), it adopted a "Savings Clause" that promised existing legal water users that if any of their water sources might be lost as a result of a CERP Project, they would be maintained at pre-enactment levels until replaced by new sources. The Corps carried forward that promise when it adopted programmatic regulations that call for specific analyses to ensure that CERP Projects comply with the Savings Clause.

2. Now, however, the Corps has broken that promise by failing to conduct a proper Savings Clause analysis to ensure that a key CERP project — the interrelated A-2 Reservoir and A-2 Stormwater Treatment Area ("STA") known as the A-2 component of the Central Everglades Planning Project ("CEPP A-2 Project") — will not transfer or eliminate existing legal sources of water. Among other problems, the Corps ignored the very specific water supply baseline called for under WRDA 2000 and the Corps programmatic regulations; and instead, utilized a baseline that assumed that significantly less water is available for agricultural, urban, and other existing legal users.

3. The Corps' approval of the CEPP A-2 Project also violates the National Environmental Policy Act ("NEPA") because the Corps failed to take a hard look at how the project would impact the environment, including agricultural and drinking water supplies. Among other problems, the Corps' analyses were fundamentally flawed because they assumed that the A-2 Reservoir and A-2 STA would be operated in tandem even though the Corps now contemplates a delay of the reservoir component of the project. Should that occur, the storage benefits of the CEPP A-2 Project will not materialize; such that more water will be delivered to the WCAs without creating new water sources for other users; thereby jeopardizing agricultural and urban water supplies.

4. While the Cooperative fully supports the CEPP A-2 Project as originally conceived, for the reasons outlined above, the Cooperative brings this action under the APA to challenge the Corps' approvals of the project pending appropriate analyses under WRDA 2000 and NEPA in order to protect its existing legal water rights.

II. **PARTIES**

5. Plaintiff, the Cooperative, is an agricultural marketing cooperative association formed and operating pursuant to Chapter 618, Florida Statutes. The Cooperative and its 42 member-farmers grow sugar cane and other crops on approximately 70,000 acres in the Everglades Agricultural Area ("EAA") in South Florida.

6. Farming in the EAA involves the use and management of surface waters which are supplied to the Cooperative and its members by the South Florida Water Management District ("SFWMD"), a creature of state law, via the regional water management project known as the Central and Southern Florida Project for Flood Control and Other Purposes ("C&SF Project").

7. As the local sponsor of the C&SF Project, SFWMD supplies water to the Cooperative and its members in accordance with "consumptive use" permits issued by SFWMD based on assurances that the use of such water is reasonable and beneficial, that it does not interfere with the rights of any existing legal users, and that it is consistent with the public interest.

8. The Cooperative and its members rely on water supplied by SFWMD from Lake Okeechobee to irrigate their crops, particularly during periods of low rainfall, such as the annual dry season and periodic droughts.

9. Defendant, the Corps, is a federal agency responsible for planning, constructing, and modifying the C&SF Project and other CERP projects.

3

### III. JURISDICTION & VENUE

10. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 1331 and 2201, and 5 U.S.C. §§ 701-706.

11. This action is brought under the APA, which provides a right of judicial review to any person adversely affected by an agency action. 5 U.S.C. § 702. The APA provides a right to judicial review of all final agency actions for which there is no other adequate remedy in a court. *Id*. § 704. The APA provides that "the reviewing court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A).

12. The Corps has taken the following actions approving the CEPP A-2 Project: (i) an August 31, 2015, Record of Decision finalizing the Final Integrated Project Implementation Report and Environmental Impact Statement for CEPP ("CEPP EIS"), which included a WRDA 2000 Savings Clause analysis; (ii) an April 17, 2020 Record of Decision for the Clean Water Act ("CWA") Section 404 Permit for the A-2 STA; (iii) a May 15, 2020, Record of Decision for the Central and Southern Florida, [EAA] Reservoir and [STA] (the Post-Authorization Change Report ("PACR")); and (iv) a May 2021, Project Partnership Agreement ("PPA") between the Corps and SFWMD governing the two agencies' responsibilities for building and operating the CEPP A-2 Project. Each of these actions constitute final agency action subject to judicial review under the APA.

13. The Corps' actions in approving the CEPP A-2 Project adversely affect the Cooperative and its members because implantation of the CEPP A-2 Project as currently

contemplated would eliminate or transfer existing legal sources of water for the Cooperative and its members before new sources of comparable quantity and quality are available to replace water that may be lost as a result of the project.

14. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 because the projects at issue in this action are intended to be constructed or implemented in this judicial district, the Defendant, the Corps, maintains a district office in this judicial district, and the farming operations of the Cooperative and its members take place within this judicial district.

## IV. STATUTORY & REGULATORY BACKGROUND

### A. WRDA 2000 & the Corps' Programmatic Regulations

15. On December 11, 2000, Congress enacted WRDA 2000, which authorized CERP as the "framework for modifications and operational changes to the [CS&F Project] that are needed to restore, preserve, and protect the South Florida ecosystem while providing for other water-related needs of the region, including water supply and flood protection." Pub. L. No. 106-541, § 601(b)(1)(A), 104 Stat. 2680 (2000). WRDA 2000 directed the Corps to implement CERP and to integrate it with ongoing federal and state projects. *Id.* § 601(b)(1)(B).

16. WRDA 2000 includes a Savings Clause to protect existing legal water users, including the Cooperative and its members. The Savings Clause provides that "[u]ntil a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act is available to replace the water to be lost as a result of implementation of the Plan, the Secretary and non-Federal sponsor shall not eliminate or

5

transfer existing legal sources of water, including those for… an agricultural or urban water supply…." *Id.* § 601(h)(5)(A), 104 Stat. 2690.

17. In 2003, the Corps promulgated programmatic regulations to implement the requirements of WRDA 2000. *See* 33 CFR Part 385. The regulations call for the Corps "to develop operating manuals to ensure that the goals and purposes of [CERP] are achieved." *Id.* § 385.28(a)(1). An operating manual must include a "system-wide manual that provides a system-wide operating plan for operation of [CERP] projects … and other features of the C&SF Project," *id.* § 385.28(a)(2), and project operating manuals that "provide the details necessary for integrating the operation of the individual projects with the system operation." *Id.*

18. Importantly, the regulations carried forward the Savings Clause enacted in WRDA 2000, by requiring that all "operating manuals … be consistent with the savings clause provisions in the Project Implementation Report and Project Cooperation Agreement and the provisions of … § 385.36…." *Id.* § 385.28(a)(6). The regulations also require the Corps to determine compliance with the Savings Clause by "comparing the availability of water with [each] recommended project with the availability of water under the pre-CERP baseline." *Id.* § 385.36(a). Consistent with the express language of WRDA 2000, § 601(h)(5)(A), the regulations define the pre-CERP baseline as "the hydrological conditions … on the date of enactment of WRDA 2000," which was December 11, 2000. *Id.* § 385.5.

### B. NEPA

19. The purpose of NEPA is "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." 42 U.S.C. § 4321.

20. NEPA and its implementing regulations require federal agencies to prepare environmental impact statements ("EIS") for major federal actions that will significantly affect the quality of the human environment. *Id.* § 4332; 40 C.F.R. § 1500, *et. seq.* In preparing an EIS, NEPA regulations require agencies to consider the environmental impacts of the proposed action, the significance of those impacts, and reasonable alternatives to the proposed action. 40 C.F.R. §1502.16(a)(1). When an agency determines that economic or social and natural or physical environmental effects are interrelated, the EIS must give appropriate consideration to those effects on the human environment. *Id.* § 1502.16(b).

21. The EIS requirement and NEPA's other "action-forcing" procedures implement the statute's sweeping policy goals by ensuring that agencies take a "hard look" at the environmental consequences of their actions and by guaranteeing broad public dissemination of relevant information.

## V. FACTUAL BACKGROUND

### A. The CS&F Project & Lake Okeechobee

22. Lake Okeechobee is the heart of the water resources system in central and south Florida. The Lake provides drinking water for surrounding communities and serves as a source of irrigation for an agricultural industry that produces sugar cane, winter vegetables, citrus, and rice.

23. A major hurricane in 1947 prompted the need for additional flood and storm damage reduction, particularly around and south of the Lake. As a result, Congress passed the Flood Control Act of 1948 authorizing the C&SF Project, a comprehensive plan to provide flood and storm damage reduction and other water control benefits in central and South Florida. Pub. L. 80–858, § 203 (1948).

24. When originally approved by Congress, the CS&F Project was recognized as a modification to a previously approved project for Caloosahatchee River and Lake Okeechobee drainage areas. *Id.* As approved in 1948, the CS&F Project was recognized as "the comprehensive plan for flood control and other purposes in central and southern Florida as recommended by the Chief of Engineers." *Id.*

25. Among other things, the CS&F Project included the raising of existing levees around Lake Okeechobee and the construction of new levees, channels, and control works for the Lake. The new dike system around the Lake was completed in the late 1960's, and named the Herbert Hoover Dike, in honor of the former President and his role in implementing levee construction. Pub. L. 86-645 (1960).

### B. Lake Okeechobee & Regulation Schedules

26. The Herbert Hoover Dike and several water control structures allow the Corps to manage the Lake to meet different objectives, including flood control and water supply. The Corps has regulated water levels in the Lake in accordance with water regulation schedules for decades.

27. In 2000, the Corps promulgated the so-called "WSE" regulation schedule, which maintained higher water levels in Lake Okeechobee than today; meaning that more water supply capacity was available in times of low water levels and drought. The WSE regulation schedule was in effect on the date of enactment of WRDA 2000 (i.e., December 11, 2000).

28. Due to concerns about the integrity of the Herbert Hoover Dike, in November 2007, the Corps issued a "Supplemental" EIS ("SEIS") to evaluate alternative regulation schedules to reduce pressure on the Dike while the Corps conducted necessary repairs. The result of that evaluation —LORS 2008— called for a significant lowering of average water levels in the Lake. Specifically, according to the SEIS, LORS 2008 was intended to maintain Lake levels 1.25 feet lower than WSE, which equates to, on average, more than 500,000 acre-feet of lost storage capacity for water supply to existing legal water users.

29. Despite assurances that LORS 2008 would be an "interim" schedule until Herbert Hoover Dike repairs were completed, LORS 2008 remains in effect even though those repairs are substantially completed. As a result, water supply for agriculture and

drinking water remains substantially reduced from levels maintained under the pre-WRDA 2000, WSE regulation schedule.

### C. The A-2 Reservoir and A-2 STA

30. The CEPP A-2 Project is a CERP Project consisting of, among other things, a reservoir in the EAA, sometimes known as the "EAA Reservoir" or the "A-2 Reservoir," that was intended to be operated in tandem with a Stormwater Treatment Area ("STA"), typically referred to as the A-2 STA, which is designed to treat water before it is released into Water Conservation Area "WCA" 3A. The purpose of the project is to improve the quantity, quality, timing, and distribution of water before it flows to the northern estuaries, WCA-3A, and, eventually, Everglades National Park, while increasing water supply for urban, industrial and agricultural users.

#### 1. Procedural History

31. Congress originally authorized the CEPP A-2 Project in WRDA 2000 and did so again in 2018 after the Corps and SFWMD substantially modified the design of the A-2 Reservoir to make it larger, in order to provide 240,00 acre-feet of storage capacity. *See* PL 115-270, 132 Stat. 3765.

32. As noted above, the Corps has taken the following actions approving the CEPP A-2 Project: (i) the August 31, 2015, Record of Decision finalizing the CEPP EIS; (ii) the April 17, 2020 Record of Decision for the CWA Section 404 Permit for the A-2 STA; (iii) a May 15, 2020, Record of Decision for the CEPP A-2 Project (PACR); and (iv) the May 2021 PPA between the Corps and SFWMD.

### 2. The Corps' Flawed Analyses

33. The Cooperative fully supports the A-2 Reservoir and A-2 STA components of CEPP as they were originally contemplated—to work in tandem to provide both water supply and water quality benefits. As described by the Corps, the purpose of the combined project is to provide storage to increase agricultural and drinking water supplies, as well as to increase treatment capacity so that more water can be delivered from Lake Okeechobee to the WCAs. If, however, the A-2 STA is operated by itself, as now contemplated, any agricultural or urban water supply benefits of the combined project would be delayed indefinitely.

34. Construction of the A-2 STA has begun, but construction of the A-2 Reservoir has not yet started. Because construction of the reservoir is a multi-year, multi-billion dollar project, the STA will be operational before the reservoir. Moreover, in its April 2020 Record of Decision, the Corps left open the possibility that the A-2 Reservoir will not be constructed at all. *See* April 17, 2020 Record of Decision, at 5 ("**If** the Corps constructs the proposed A-2 Reservoir…") (emphasis added). Yet the Corps arbitrarily failed to address this potentiality, as well as other important issues, in its analyses of the A-2 Reservoir and A-2 STA.

35. The Corps' modeling analyses concluded that the combined A-2 Reservoir/STA project would increase agricultural and urban water supply over current levels because the A-2 Reservoir would provide critically need water storage. However, the hydrologic modeling underlying those Savings Clause analyses assumed concurrent operation of the A-2 Reservoir and A-2 STA. None of the analyses evaluated the impact

11

on agricultural and urban water supply if the A-2 Reservoir and A-2 STA are not operated in tandem because the Reservoir is delayed as now contemplated by the Corps. The Corps' failure to evaluate the full range of operational scenarios now under consideration constitutes a violation of NEPA.

36. In its Savings Clause analysis for A-2 Reservoir, the Corps did not use the pre-CERP baseline as required by WRDA 2000 § 601(h)(5)(A) and the Corps' own regulations; but instead used the significantly lower water supply provided by LORS 2008 as the baseline. This fundamental flaw in the evaluation of the A-2 Reservoir leaves existing legal water users, including the Cooperative and its members, at substantial risk that their existing water sources as of the date of enactment of WRDA 2000 will be eliminated or transferred without corresponding new water sources.

## COUNT I

### Violation of WRDA 2000 & APA

37. Plaintiff, Sugar Cane Growers Cooperative of Florida, re-alleges and incorporates by reference paragraphs 1 through 18 and 22 through 34, and 36 of this Complaint as though fully set forth herein.

38. The Corps' use of the water supply provided by LORS 2008 as the baseline for its Savings Clause analyses for the A-2 Reservoir and A-2 STA components of CEPP, rather than the Pre-CERP baseline (i.e, December 11, 2000), constitutes a violation of WRDA 2000 § 601(h)(5)(A).

39. If the A-2 Reservoir and A-2 STA are not operated in tandem because the Reservoir is delayed as now contemplated by the Corps, the assumption underlying

12

hydrologic modeling for its Savings Clause analyses that A-2 Reservoir and A-2 STA would be operated concurrently constitutes a violation of WRDA 2000 § 601(h)(5)(A) and the Corps' CERP programmatic regulations at 33 C.F.R. Part 385.

40. The actions described in Paragraphs 40, 41, and 43 through 45 above individually and collectively are a violation of WRDA 2000 § 601(h)(5)(A), and are arbitrary, capricious, an abuse of discretion, contrary to law, and taken without observance of procedures required by law within the meaning of 5 U.S.C. § 706(2).

## COUNT II

### Violation of NEPA and APA

41. Plaintiff, Sugar Cane Growers Cooperative of Florida, Inc., re-alleges and incorporates by reference Paragraphs 1 through 14 and 19 through 35 of this Complaint as though fully set forth herein.

42. The Corps' actions in approving the CEPP A-2 Project (as described in Paragraphs 12 and 32 above), individually and collectively violate NEPA because:

    a. The Corps' failure to evaluate the impact on agricultural and urban water supply if the A-2 Reservoir and A-2 STA are not operated in tandem because the Reservoir is delayed constitutes a failure to evaluate all alternatives to the agency's proposed action in violation of NEPA.

    b. The flaws in the Corps' modeling analyses reflect a failure to take a hard look at the impacts of the A-2 Reservoir and STA components of CEPP on the human environment in violation of NEPA because the lack of water storage would

13

result more water being sent south to the WCAs to the detriment of agricultural and urban users.

43. For the reasons set forth above, the Corps' actions in approving the CEPP A-2 Project are individually and collectively arbitrary, capricious, an abuse of discretion, contrary to law, and taken without observance of procedures required by law within the meaning of 5 U.S.C. § 706(2).

## **PRAYER FOR RELIEF**

Plaintiff, Sugar Cane Growers Cooperative of Florida, Inc. respectfully requests that the Court enter judgment for the Plaintiff and provide the following relief:

A. Declare that the Corps' actions in approving the CEPP A-2 Project contravene WRDA 2000;

B. Declare that the Corps' actions in approving of the CEPP A-2 Project contravene NEPA;

C. Declare that the Corps' approval the CEPP A-2 Project is arbitrary, capricious, and an abuse of discretion in contravention of the APA;

D. Vacate the Corps' approval of the CEPP A-2 Project pending further agency review consistent with the WRDA 2000 Savings Clause and NEPA;

E. Grant such other relief as may be authorized by law and the Court deems just and appropriate.

Dated: August 26, 2021

Respectfully submitted,

*/s/ Gary V. Perko*
Gary V. Perko (FBN 855898)
gperko@holtzmanvogel.com
Gary K. Hunter (FBN 949779)
ghunter@holtzmanvogel.com
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
119 South Monroe Street, Suite 500
Telephone: (850) 270-5938

Counsel for SUGAR CANE GROWERS
COOPERATIVE OF FLORIDA